UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,

    Plaintiff,

        v.

Andreqio Stevens,

    Defendant.

Case No. 1:20cr112

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court on Defendant's Motion to Suppress. (Doc. 18). The United States filed a Response in Opposition. (Doc. 21). The Court conducted an evidentiary hearing on February 11, 2021 (Docs. 22, 23), and the parties submitted post-hearing briefs (Docs. 24, 26, 27).

I. **BACKGROUND**

The following facts were revealed at the evidentiary hearing at which the Court heard testimony from Cincinnati Police Department ("CPD") Officer Robert Lind and received into evidence and reviewed the Government's Exhibits 1-7 (PX#1 - a location map and PX#3-7 - photographs) as well as Defendant's Exhibits 1-6 (DX#1 - Affidavit for Search Warrant and Search Warrant; DX#2 - CPD Trial Preparation Report; DX#3 - Incident Detail Report; DX#4 – Officer Lindsey's body cam video/audio;[1] DX#5 - outside apartment complex security video;[2] DX#6 – Officer Davis's body cam video[3]).

---

[1] (Doc. 23, Officer Lind testimony, PageID 111-13).
[2] (*Id.* PageID 86).
[3] (*Id.* PageID 97-98, 126-27).

On May 12, 2020, the CPD received several 911 calls regarding a man waiving a firearm in the parking lot of an apartment building located at 273 Fairbanks Avenue, Cincinnati, Ohio ("the apartment building"). *See e.g.*, (DX#3) ("MALE OUTSIDE W/GUN/M/B DREDS,, GRN HAT,, CAMO JKT W.HOODIE,, DRK BLU STRIPED PANTS// L/S IN PARKING LOT"); ("RPT OF MAN IN PARKING LOT WAIVING GUN IN AIR THREATNENING TO KILL EVERYBODY, SUBJ SAYING GUN IS 380 AND COMP SAW GUN,, SUBJ IS MB, 5'11, MED BLD, NEON GRN HAT, CAMO JACKET, BLUE ADIDAS PANTS"). One of those 911 callers was concerned because there were children outside of the apartment building. *Id.* The CPD call center dispatched officers to the apartment building.

The apartment building's outside security camera video from May 12, 2020 reveals a shirtless man, later identified as Defendant, carrying a green hat, walk out of the apartment building and out of the camera's view. (DX#5). The security video then shows several passersby enter the building as Defendant remains outside but out of the camera's view. (DX#5). The security video then reveals Defendant walk across one of the building's entrances but remain outside, still shirtless, and now wearing the green hat and brandishing a handgun. (DX#5 at 17:10:04). The security video shows Defendant pace back and forth, appearing to yell at someone or something that is off-camera, while waiving the handgun, (*id.* at 17:10:04-17:10:12) and then appearing to point the handgun at someone or something that is off-camera (*id.* at 17:10:13-17:10:21). The security video then shows Defendant run into the building (*id.* at 17:10:35), to be followed – in seconds – by a uniformed officer who is immediately followed by two other officers, one in uniform

2

and one in plain clothing (*id.* at 17:10:44-17:10:52). The plain clothes officer is Officer Lind. (*Id.*); (Doc. 23, Lind testimony, PageID 88).

Officer Lind testified that, on May 12, 2020, he was a member of the CPD's Gun Crime Task Force, and in plain clothes and an unmarked police cruiser when he responded to a church parking lot, across the street the from apartment building, where he initially observed Defendant waiving a handgun outside the apartment building. (Doc. 23, Lind testimony, PageID 82-84). Officer Lind stated that, at around 17:10 hours and from his view, he observed Defendant in the apartment building's parking lot with a handgun, other people nearby Defendant, and cars coming in and out of the apartment building's parking lot. (*Id.* PageID 85). Officer Lind testified that he saw Defendant point the handgun at people, extend his arm that was holding the handgun, and make a recoil motion as if Defendant was firing the handgun. (*Id.*). In one instance, Officer Lind he observed Defendant point the handgun at a minivan, extend his arm that was holding the handgun, and make a recoil motion as if Defendant was firing the handgun at the minivan. (*Id.* PageID 85-86); *see* (PX#4 (photograph recovered from the apartment building's security system)); (PX#5 (photograph recovered from the apartment building's security system)). Officer Lind subsequently observed a couple of young children exit the minivan. (Doc. 23, Lind testimony, PageID 86). Officer Lind then gave the uniformed officers arriving to the scene in their cars an updated description of the Defendant based on Officer Lind's observations. (*Id.* PageID 87).

After Defendant entered the apartment building, and was quickly followed by two uniformed officers and Officer Lind, Officer Lindsey's police body cam and audio reveal, and Officer Lind's testimony confirms, that police officers surrounded the apartment

building at approximately 17:11:51 hours, *i.e.*, a minute and half after Defendant entered the apartment building. (DX#4); (Doc. 23, Lind testimony, PageID 113). Officer Lind testified that he was "almost certain that" Defendant did not exit through the apartment building's back door due to Officer Lind's position and vantage points inside the apartment building quickly after Defendant entered. (Doc. 23, Lind testimony, PageID 112).

Also after Officer Lind and the two uniformed officers entered the apartment building, and although they did not see which apartment unit Defendant entered, they determined that Defendant went to the apartment building's third floor which had four separate units. (*Id.* PageID 88-91, 111). The officers obtained consensual searches of three of the four units on the apartment building's third floor and determined that Defendant was not in those three units. (*Id.* PageID 90). Thus, the officers were able to determine the unit that Defendant was in by process of elimination. (*Id.* PageID 90-91). Officers then announced their presence outside of the unsecured unit on the third floor and told Defendant to surrender and come out. (*Id.* PageID 91). Defendant did not respond or comply. (*Id.*). Officer Lind called the SWAT team coordinator to respond to the apartment building and asked a CPD detective to start writing a search warrant for the unsecured unit on the third floor. (*Id.* PageID 92).

Officers remained outside of the unit and, approximately two hours later, an occupant inside of the unsecured unit on the third floor asked, through the door and in response to officers' reiterated demands to come out, if the officers have a warrant. (DX#4 at 19:09:02). An officer responded, inaccurately, that the officers had a warrant. (*Id.* at 19:09:03); (Doc. 23, Lind testimony, PageID 120). Defendant crawled out of door of the unsecured unit on the third floor with his hands facing forward per the officers' instructions.

4

(DX#4 at 19:09:37-19:09:42); (Doc. 23, Lind testimony, PageID 94-95). Defendant was placed under arrest immediately after he exited the unsecured unit on the third floor. (Doc. 23, Lind testimony, PageID 95, 130-31). After officers arrested Defendant, they used their radios to communicate additional and updated information, *i.e.*, that Defendant exited the apartment unit, to the CPD detective who was putting together the Affidavit for a Search Warrant and then driving to the magistrate judge's home for signature. (*Id.* PageID 93, 95, 121-23); *see* (DX#1) ("After approximately one hour of officers establishing a perimeter, a female black and male black exited #19 and surrendered to officers.").

The magistrate judge signed the Search Warrant for the unsecured unit on the third floor at 7:35 PM, or 19:35:00 hours. (DX#1); (Doc. 23, Lind testimony, PageID 92). Neither the SWAT team nor CPD officers entered the unit until the magistrate judge signed the Search Warrant. (Doc. 23, Lind testimony, PageID 94).

At 19:42:00 hours, and after the SWAT team completed their protective sweep of the unit that Defendant was in, the officers began searching the unit, for purposes of the search warrant execution. (PX#6); (PX#7) (Doc. 23, Lind testimony, PageID 97-100); *see also* (DX#6). Officers found a firearm in the apartment during their search. (Doc. 23, Lind testimony, PageID 100-01).

On September 24, 2020, a one-count indictment charged Defendant with possession by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (Doc. 3).

Defendant moves to suppress any and all evidence seized during the search of his apartment unit on May 12, 2020. (Doc. 18). He brings his arguments pursuant to the Fourth Amendment. *Id.* He argues that the officers unlawfully searched his apartment, as

5

they lied to him when they told him that they had a warrant and then used the unlawfully obtained information, *i.e.*, that he was in his apartment, to obtain a search warrant of his apartment. (Docs. 18, 24, 27). The Government responds that the officers acted reasonably under the Fourth Amendment and, alternatively, the officers would have been justified in making a warrantless entry into Defendant's apartment unit in hot pursuit. (Doc. 26).

II. **ANALYSIS**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)). To ensure that people are protected in their homes, police officers generally need a search warrant that is issued by a neutral magistrate judge and based on sufficient probable cause prior to entry. *United States v. Williams*, No. 1:14-CR-118, 2015 WL 3884725, at *6 (S.D. Ohio June 24, 2015), *aff'd*, 656 F. App'x 751 (6th Cir. 2016).

There are, however, exceptions to the Fourth Amendment's warrant requirement. Although there is no exhaustive list of circumstances that qualify as "exigent," the Sixth Circuit has previously characterized the situations in which warrantless entries are justified as lying within one of four general categories: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and

(4) a risk of danger to the police or others. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996) (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994)); *accord Zar v. Payne*, 760 F. Supp. 2d 779, 787 (S.D. Ohio 2011); *cf. Payton*, 445 U.S. at 583 (describing "exigent circumstances" as emergency or dangerous situations that would justify a warrantless entry into a home for the purpose of either arrest or search); *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) ("Exigent circumstances are situations where real immediate and serious consequences will certainly occur if the police officer postpones action to obtain a warrant.") (internal quotation marks omitted).

Pertinent here, the hot pursuit of a fleeing suspect can be an exigent circumstance justifying a warrantless arrest in one's house. *Cf. Minnesota v. Olson*, 495 U.S. 91, 100-01 (1990). Without doubt, though, not all pursuits are hot pursuits. *See Welsh v. Wisconsin*, 466 U.S. 740, 751-53 (1984) (holding that the gravity of the underlying offense for which the arrest is being made is an important factor to be considered when determining whether the hot pursuit exigency exists). Based on the specific facts of the case presented at the evidentiary hearing, the Court finds that the exigent circumstance of hot pursuit justified the officers' warrantless entry into Defendant's apartment unit to arrest him, and the officers found the firearm during their search of the unit incident to their lawful arrest of Defendant, to ensure the safety of the officers and others.

Officer Lind and the two uniformed officers who first entered the apartment building, seconds after Defendant, were in hot pursuit of Defendant, who Officer Lind had just observed, among other actions, waive, point, and mimic a recoil motion with a handgun at a minivan with children inside, and the officers eliminated all but one apartment unit on the third floor, the unit from which Defendant eventually exited. Officer

Lind and the two uniformed officers maintained immediate and continuous pursuit of Defendant from the scene of where Defendant pointed the handgun at children to the apartment building's third floor where they subsequently identified the only unsecured unit as the unit Defendant was in. *See Welsh*, 466 U.S. at 753. Officer Lind was almost certain that Defendant did not exit through the apartment building's back door due to Officer Lind's position and vantage points inside the apartment building seconds after Defendant entered. (Doc. 23, Lind testimony, PageID 112). Based on these facts, the Court finds that the Government has met its burden to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to warrantless home entries. *Cf. Id.* at 750 ("[Courts'] hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor."). Further, the Court finds that the officers would have found the firearm during their protective sweep of the apartment incident to their lawful arrest of Defendant to ensure the safety of the officers and others. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990); *United States v. Taylor*, 248 F.3d 506, 513-14 (6th Cir. 2001); *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) (regarding arrests immediately outside of one's home).

Defendant argues that the officer's misrepresentation that the officers had a warrant is fatal to the Government's argument. (Docs. 18, 24, 27). Defendant's reliance on *United States v. Shaw*, 707 F.3d 666 (6th Cir. 2013), and *Bumper v. North Carolina*, 391 U.S. 543 (1968) is misplaced. In *Shaw*, officers were confronted with an incorrect address listed in a search warrant and, upon realizing the mistake, those officers incorrectly guessed which house was the correct address and entered the wrong home.

In *Bumper*, two days after the offense and prior to the defendant's arrest, officers falsely represented to the defendant's grandmother that they had had a search warrant to obtain consent to search her home. Those cases are not factually similar to this case. Here, as stated above, the officers were in hot pursuit and faced with exigent circumstances, and a warrant was not required. Contemporaneously, a CPD detective was already working on obtaining a search warrant using information provided through the on-scene officers' radios and the signature was in process.

This Court determines that a warrant was not required to enter Defendant's apartment unit. However, this Court also finds that the Affidavit for Search Warrant contains the requisite probable cause for the Search Warrant. *See* (DX#1). This Court further holds that the inevitable discovery rule applies. In *Nix v. Williams*, 467 U.S. 431 (1984), the U.S. Supreme Court established an exception to the exclusionary rule for evidence seized in violation of the Fourth Amendment that inevitably would have been discovered by lawful means. *United States v. Keszthelyi*, 308 F.3d 557, 573-74 (6th Cir. 2002). *Nix* held that, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* (quoting *Nix*, 467 U.S. at 444). The Sixth Circuit has held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id.* (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995)). In sum, the Court

finds that the entry into and search of Defendant's apartment did not violate his Fourth Amendment rights.

## III. CONCLUSION

In light of the foregoing, it is hereby **ORDERED** that Defendant's Motion to Suppress Evidence (Doc. 18) is **DENIED**.

**IT IS SO ORDERED.**  _/s Michael R. Barrett_____
Michael R. Barrett
United States District Judge